255 So.2d 332

Morris SCHIFFMAN

v.

H. L. RABURN & CO., a partnership composed of Herbert L. Raburn and Hasbrouck Haynes, Jr.

6 Div. 97.

Court of Civil Appeals of Alabama.

Sept. 29, 1971.

Rehearing Denied Oct. 27, 1971.

Rogers, Howard, Redden & Mills, Birmingham, for appellant.

Eugene M. Zeidman, Birmingham, for appellee.

THAGARD, Presiding Judge.

Appellant Schiffman prosecutes this appeal from a judgment of $3,950.00 rendered by the trial court, without a jury, for appellee, H. L. Raburn and Company.

Appellee, a firm of certified public accountants, sued on the common counts for work and labor done for appellant and for accounting services done for appellant at his request, etc. Demurrer to the complaint was overruled, whereupon appellant pleaded the general issue in short by consent, said plea including a plea of the statute of frauds.

The evidence discloses that Mr. Schiffman was president of Columbia Mobile Homes, Inc., a corporation that was bankrupt at the time of the trial. The work done by appellee consisted of auditing the account books of Columbia Mobile Homes, Inc.; preparing a financial statement showing its condition; making payroll tax returns, some that were already delinquent when Raburn was employed and others that became due during the period of employment; and making at least one income tax return. Here we quote from a portion of H. L. Raburn's testimony anent the circumstances of the employment of his firm by Schiffman:

"Q Who employed you?

"A Morris Schiffman.

"Q Tell the Court the nature of the employment?

"A Mr. Schiffman called, and came to visit me, and asked that we do some work for him. The work was relative to a corporation that he owned, called Columbia Mobile Homes, Inc., he brought, at the time when he came in, he gave to me a penciled copy of a balance sheet that purported to be on Columbia Mobile Homes.

\*      \*      \*      \*      \*      \*

"Q Now, that plans sheet, if you recall, what did it show the condition of the Columbia Mobile Homes to be?

"A It showed a deficit.

"Q All right. Did you have any conversation—had you ever met Mr. Schiffman before?

"A I met him, maybe a day or two before that, with one of the members of the bank.

"Q What was that occasion?

"A . Mr. Schiffman had borrowed some money from the bank, and the bank was demanding that he have some financial statements to show to the bank, whether or not it was a good loan.

\* \* \* \* \* \*

"Q. Who made the appointment?

"A Mr. Schiffman.

"Q Called you and made a luncheon appointment?

"A Yes, sir.

"Q Did you all go to the bank at that time?

"A No, sir. We met one of the bank officers for lunch.

"Q One of the bank officers and you and Mr. Schiffman had lunch together?

"A Yes, sir.

\* \* \* \* \* \*

"Q What was the conversation at that time?

"A Mr. Schiffman had a corporation that was in trouble, and had to have some financial statements on it, before they would lend money to him, or loan money to him, and would not extend that loan.

\* \* \* \* \* \*

"Q Now, then, after this luncheon meeting, Mr. Schiffman came to your office?

"A Yes, sir.

"Q What did you say the conversation was?

"A He said he wanted some financial statements prepared, as soon as possible.

"Q What firm was this on?

"A Had to have some on the Columbia Mobile Homes, Inc., for two reasons. He also had to have, in addition to financial statements, payroll tax returns prepared, because payroll tax returns were delinquent and money was due to the Internal Revenue Service.

"Q Do you know what his connection with Columbia Mobile Homes was?

"A He was a hundred percent stockholder.

"Q All right. Did you discuss the fee arrangements with him then, or at a subsequent time, or both?

"A I told him it was a policy of our firm, that when we did something like this, we either got pain (paid?) in advance, or that the individual guaranteed that he was going to pay that, because obviously if—

\* \* \* \* \* \*

"Q I will ask you this: Who employed you?

"A Mr. Morris Schiffman.

"Q Now, as far as guarantee, did you say that he was to pay you, you were looking to him for payment, that's what you told him?

"A Yes, sir.

\* \* \* \* \* \*

"Q And this financial statement that he did furnish you, you say, it was of Columbia Mobile Homes and shows it had more liabilities than assets?

"A Yes, sir."

Mr. Raburn then testified that he went with Schiffman to visit the plant in Columbia, Alabama, and that after being there two hours he told Schiffman that the liabilities there were at least a hundred and fifty thousand or two hundred thousand dollars, which was more than Mr. Schiffman thought, and that Raburn told Schiffman he did not think the corporation could survive, whereupon Schiffman said: "I have personally guaranteed payment to suppliers, and I have guaranteed everything at the bank, and all of those payrolls."

Raburn further testified that before he did any work for the corporation Schiffman furnished him with balance sheets of

several other corporations of which Schiffman was majority stockholder and also a personal balance sheet showing Schiffman to have a net worth of $326,031.00. With reference to the personal balance sheet Raburn testified as follows:

"Q And, now, I show you a balance sheet of Morris E. Schiffman, dated March 31, 1967, when was that furnished to you, sir?

"A Furnished me—to me, at the same time, by Mr. Schiffman.

"Q Was that at the time he was seeking to employ you, personally?

"A Yes, sir."

With reference to Schiffman's liability for the unpaid withholding and social security taxes, Raburn testified:

"Q * * * Is there a personal liability on sole stockholders, in a case of this kind where the taxes, the withholding taxes, and social security have not been paid?

"A Yes, sir.

"MR. CLEVELAND: Objection.

"MR. ZEIDMAN: He is an expert, the Court knows that, but I just thought there is no argument about it.

"THE COURT: Overruled. Let him answer.

"Q Is that so?

"A There is a personal liability, and Mr. Schiffman so stated that to me at that time."

Later, H. L. Raburn, being recalled, testified as follows:

"Q When were you furnished Mr. Schiffman's personal financial statement and a financial statement of these three mobile home companies that he owned?

"A When he went down to Columbia Mobile Homes and saw that it was in real bad shape, that's when I said, 'We can-not do work for these.' He said, 'I am responsible for it individually.'

*    *    *    *    *    *

"Q That's right. At the time you went down to that place of business, and was that when he furnished it to you?

"A Yes, sir.

"Q All right. Had you done any of the work for which you have now billed him, up to that time?

"A No, sir, that was my first trip down.

"Q And tell us now, what he said to you when you told him that you could not do that work for the Columbia Mobile. Homes?

"A He said, 'You are working for Morris Schiffman and Morris Schiffman is a responsible individual. And here this is proof that I am, because I am worth $300,000.00.' And gave me the other statement and showed this was included."

Appellant's motion for a new trial contains ten grounds, but they are all postulated on the position that defendant's promise to pay was one of suretyship, and therefore was void under the Statute of Frauds. On the other hand, appellee contends that the promise of Schiffman to pay for the accounting services was an original promise and not a collateral promise; that when appellee entered upon the work that Schiffman wanted done appellee knew that the corporation was insolvent and would not have extended credit to the corporation and so informed Schiffman, whereupon Schiffman assured plaintiff that plaintiff was working for him, Morris Schiffman, and that Morris Schiffman was a responsible individual and amply able to pay for the work that plaintiff was called upon to perform. These conflicting contentions made up the principal issue that the court was called upon to decide.

The court made no written finding of fact in its original judgment, but in its. order overruling defendant's motion for

a new trial the court wrote, inter alia, as follows:

"The defense of the statute of frauds was considered by the Court but the Court was of the opinion, and so found, that both Columbia Mobile Homes, Inc. and Morris Schiffman personally had a substantial interest in having the audit work performed and the financial statements prepared. The Court further finds that the plaintiff was employed by Mr. Schiffman both in an individual capacity and while acting as President of Columbia Mobile Homes, Inc. and that both he and the company thereby obligated themselves to pay for the work performed. The Court does not feel that it is necessary to set forth the evidence which lead[s] to this finding."

The factual situation in this case, as disclosed by plaintiff's testimony, and which was evidently accepted by the trial judge, is very similar to that in Danley v. Marshall Lumber and Mill Company, 277 Ala. 551, 173 So.2d 94. In the *Danley* case, plaintiff's evidence was to the effect that appellee corporation operated a building material supply house; that appellee delivered some building materials to Kelly corporation equal in value to the amount of the judgment and for the purchase of which judgment was entered against appellant; that defendant at the time of said sales and deliveries was a stockholder and officer of said Kelly corporation; that prior to said sales and deliveries said Kelly Company did not have an established credit with appellee; that the deliveries were made at the instance and order of appellant; and that, at the request of appellant, the sales were entered on the books of appellee in the name of Kelly Company, and no entries were made on said books in the name of defendant. The defendant denied that he authorized such sales and deliveries on his credit to the exclusion of Kelly Company, and he insisted that he signed no agreement, note or memorandum to answer for the debt of Kelly Company

to plaintiff. In its opinion the court said, inter alia:

"A factual issue of such extension of credit was made when defendant denied categorically that he ever agreed to be responsible, directly or indirectly, for payment of the debt incident to the delivery of said materials.

"We have consistently held that where there was evidence justifying a conclusion of the trial court, sitting without a jury, such conclusion will not be disturbed unless palpably wrong. National Surety Co. v. Julian, 227 Ala. 472, 150 So. 474(17). This rule has application to the case at bar and we adhere thereto.

"The factual basis for the judgment rendered by the trial court is agreeable with our pronouncement in the case of Marx v. Bell, Moore & Company, 48 Ala. 497(1), wherein we held 'that if credit is given to A, a promise by B to pay the debt, must be in writing, to be obligatory; but if credit in the first instance, is given to B, although the consideration passes to A, it is an original undertaking by B, and he is bound to perform it, although there is no writing.'" (277 Ala. at pages 555 and 556, 173 So.2d at page 98)

The Supreme Court affirmed plaintiff's judgment.

We see no material difference in the factual situations of *Danley*, supra, and our case, except that in the *Danley* case the account accrued from the sale of merchandise and in our case it accrued from the rendition of accounting services.

There is one material difference in the *Danley* case, supra, and the case before us. In the *Danley* case the record did not disclose a finding of fact by the trial judge, so the Supreme Court assumed that the trial judge based the judgment on a finding from the evidence "that credit was extended exclusively to Mr. Danley for the items delivered to Kelly Company;

and also to sustain the conclusion of the trial court that the entry of said sales to the account of Kelly Company was at the direction of defendant." But in the case before us the trial judge disclosed in his order denying a new trial that he found that plaintiff was employed to render the accounting services to Schiffman personally and to the corporation and that both were liable for the value of the services. We think the evidence in the case before us was amply sufficient for the trial court to have found that credit was extended exclusively to Mr. Schiffman and that Raburn did not look to the corporation for payment, but we are bound by the conclusions of the trial court and must consider the case accordingly.

In Puckett v. Bates, 4 Ala. 390 (1842), it was held that:

"The principal distinction, with respect to the undertaking, recognized by the Court, is between one that is *original* and one that is *collateral*. The law is certainly well established that if the person for whose debt, default or miscarriage the undertaking is made, be liable at all so that the whole responsibility does not rest upon the second promissor, the second promise is *collateral*, and is void by the statute if not reduced to writing. * * *" (4 Ala. at page 391)

The rationale that the second promise is collateral if the person to whom consideration passes is liable at all was extended even further in Boykin v. Dohlonde & Co., 37 Ala. 577.

■ So, in view of the law as propounded in *Puckett*, supra, and *Boykin*, supra, we must conclude that if the claim in this case was based upon a promise by Schiffman to pay the debt of the corporation, and that the sole consideration for the promise was to flow to the corporation, the promise was void under the statute of frauds

In Marx v. Bell, Moore and Company, 48 Ala. 497(1), cited and quoted from in *Danley*, supra, the court held "that if credit is given to A, a promise by B to pay the debt must be in writing to be obligatory; but if credit in the first instance is given to B, although the consideration passes to A, it is an original undertaking by B, and he is bound to perform it, although there is no writing."

■ But, what if the credit in the first instance is given to both A and B simultaneously and the consideration passes to both A and B? We think and hold that such a contract, though not in writing, would be an original joint undertaking on the part of A and B; that they would be jointly and severally liable, and that neither would be guarantor or surety for the other.

■ In the case before us the trial court found that both the corporation and Morris Schiffman personally had a substantial interest in having the accounting work performed; that the plaintiff was employed by Schiffman, both in an individual capacity and as president of the corporation, and that both he and the company obligated themselves to pay for the work performed. This was tantamount to holding that Schiffman and the corporation, to both of whom the consideration passed, became simultaneously liable, jointly and severally, to pay for the work to be done, and that neither of them became security for the debt of the other. We think the evidence for the plaintiff, parts of which are hereinabove quoted, and which the court evidently accepted, fully sustained this finding.

■ Appellant argues in his brief that the court erred in rendering judgment for the plaintiff and in denying defendant's motion for a new trial, because of the plaintiff's failure to prove that the charge for the services rendered was reasonable. The record shows the following testimony by Mr. Raburn on that point:

"Q  Do you consider these reasonable charges you made Mr. Schiffman?

"A  Very reasonable, we tried to be to all of our clients.

"Q In an effort to recover you did reduce it some and the total was $3,950.00.

"A $3,950.00, yes sir."

The witness was not cross-examined on this phase of his testimony and no effort was made to rebut it. As far as the record discloses no point as to the sufficiency of this testimony was made at the trial. We hold that there was no error here.

Assignments of Error 3 and 4 had to do with the overruling of certain portions of evidence offered by plaintiff, and were based upon appellant's assumption that the contract was one of guarantyship. In view of the trial court's conclusion otherwise, which we affirm, these rulings were not in error.

There being no error in the record, the judgment of the trial court is

Affirmed.